**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JEFFERY S. RICHARDSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 4:19-cv-2364-SNLJ** |
| | ) | |
| **STANLEY PAYNE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM AND ORDER**

This case is a petition under 28 U.S.C. § 2254 for writ of habeas corpus. Petitioner Jeffery S. Richardson is an inmate at the Eastern Reception Diagnostic Correctional Center in Bonne Terre, Missouri. In 2013, Richardson was convicted by a jury on one count of first-degree assault, in violation of Section 565.050 RSMo, and one count of armed criminal action, in violation of Section 571.015 RSMo. The trial court sentenced Richardson to 20 years' imprisonment on both counts, to run concurrently. The conviction and sentence were affirmed on direct appeal (Resp. Ex. C), Richardson's Rule 29.15 motion was denied by the trial court (Resp. Ex. J, pp. 62-70), and the Rule 29.15 denial was affirmed on appeal (Resp. Ex. H).

In his petition before this Court, Richardson raises four grounds for relief: 1) ineffective assistance of counsel—failing to investigate and present evidence regarding the side effects of a drug known as "Effexor"; 2) trial error in the refusal to instruct the jury on self-defense; 3) ineffective assistance of counsel—failing to object to

prosecutorial misconduct; and 4) ineffective assistance of counsel—failing to rehabilitate the testimony of Officer Stevens.

This Court will deny the petition. Richardson raised the first three grounds for relief in state court, which were denied on the merits. On those claims, this Court will defer to the decision of the Missouri Court of Appeals under 28 U.S.C. § 2254(d). On the fourth ground for relief, it was procedurally defaulted—having not been raised either to the trial court or the Missouri Court of Appeals—and any blame placed on counsel for failing to raise it does not excuse the default because the claim, even if it were made, has no merit.

## I. STATEMENT OF EXHIBITS

In support of this memorandum, this Court cites the following exhibits as set out in the response to show cause, ECF #12.

1.  Respondent's Exhibit A is Richardson's brief on direct appeal.

2.  Respondent's Exhibit C is a copy of the Missouri Court of Appeals' decision affirming the conviction and sentence.

3.  Respondent's Exhibit J is a copy of the legal file from Richardson's state post-conviction appeal.

4.  Respondent's Exhibit F is Richardson's brief on post-conviction appeal.

5.  Respondent's Exhibit G is a copy of the State's brief on post-conviction appeal.

6.  Respondent's Exhibit H is a copy of the Missouri Court of Appeals' decision affirming the denial of post-conviction relief.

## II.  BACKGROUND

"In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. 2254(e). During Richardson's direct appeal, the Missouri Court of Appeals summarized the relevant facts and procedural background as follows:

> On September 12, 2011, Appellant stopped at a convenience store at approximately 9:00 p.m. while on his way home. Appellant parked his mother's GMC Yukon in front of the store, entered the store and purchased a six-pack of beer.
>
> While Appellant was inside, Marvin Huntley and his cousin, Ricky Bolden, arrived at the same store in Bolden's car. Bolden parked two spaces to the left of Appellant's vehicle. Bolden went into the store while Huntley remained in the passenger seat.
>
> Huntley testified Appellant came out of the store, stared at him briefly, and then approached him. Huntley stated Appellant introduced himself and asked Huntley for marijuana. When Huntley responded that he did not "smoke," Appellant said something to him about how "[he] just ran from the police" and asked him a strange question. Huntley testified he did not know how to respond so he asked Appellant for a lighter. Appellant, however, testified he was walking to his car after leaving the store when Huntley called him over and asked for a lighter.
>
> Appellant then walked back to the Yukon, put his beer inside and retrieved his lighter for Huntley. Appellant handed the lighter to Huntley, who lit his cigarette and returned the lighter to Appellant. Appellant returned to his vehicle. Appellant testified he sat in his vehicle for a minute because he was going to light a cigarette.
>
> At this time, Bolden came back to the car and asked Huntley for some change to buy Huntley cigarettes. Huntley told Bolden about his interaction with Appellant and pointed Appellant out to Bolden. Bolden told Huntley to "forget that white man" and walked back into the store.

Appellant testified he saw Huntley turn toward him and heard Huntley say something that he did not understand. Appellant thought Huntley had asked for help changing a tire or "something." Appellant testified he got out of his vehicle and walked over to Bolden's car while looking at the tires. At the same time, Huntley got out of the car to tell Bolden to "come on" so they could leave.

Appellant testified he followed Huntley around the car, looking at the tires of Bolden's car, because he thought Huntley was leading him around the front of the car. Appellant testified when he saw none of the tires were flat, he became confused about where Huntley was going. Appellant asked Huntley what Huntley had said to him. Huntley told Appellant he did not say anything, or "no bull crap," told Appellant to leave him alone and turned away from Appellant.

Huntley testified Appellant kept approaching him so he turned around to face Appellant and backed away from Appellant. Appellant kept asking Huntley what he had said. Huntley testified it was an awkward situation, he was uncomfortable, and he felt that Appellant would not leave him alone. Huntley testified Appellant kept coming towards him and Huntley thought "something" was going to happen so he defended himself by slapping Appellant.

Appellant testified Huntley hit him with his left hand and Appellant saw a bright flash and Huntley's right hand go down. Appellant testified he thought Huntley was going for a weapon and he "went into survival mode" because he felt his life was in danger. Appellant testified he panicked because he did not know what Bolden, who was inside the store, was going to do and "[t]his guy went crazy on me for no reason, [I was] trying to help him out." Appellant immediately drew his gun from his pocket and fired it. Appellant testified that after the first shot, Huntley raised his arms up and it seemed like Huntley started to lunge at him again so he fired a second shot.

Appellant testified he actually never saw Huntley with a weapon or a gun. Rather, Appellant saw a bright light, and Huntley's hand go down and Appellant "thought he was going for a weapon." Appellant testified he believed Huntley was armed "[b]ecause why would somebody attack you right out in front of the store unless -- I just panicked, you know. I figured I was in big trouble and I thought he was just going to cause me real damage."

4

The entire incident was recorded on the convenience store's security camera and was admitted at trial. The video shows that in the seconds after Huntley struck Appellant and Appellant grabbed his gun, Huntley took several steps backward before coming to a stop with his arms to his sides while Appellant took several steps toward Huntley with his gun pointed at Huntley. The video shows Appellant firing one shot while Huntley was standing and the second shot as Huntley fell backward to the ground and as Appellant began to turn and walk away.

After shooting Huntley, Appellant immediately got into the Yukon and drove to his mother's home, where he parked the vehicle behind a pickup truck in the driveway. Appellant changed his pants and shoes. Officer John Stevens, who received a broadcast about the shooting and a description of the Yukon, spotted the Yukon parked in the driveway of Appellant's mother's house and made contact with Appellant. When Stevens inquired about the last person to drive the vehicle, Appellant stated his friend "Chris" was the last person to drive the car but could not provide any additional information about Chris. Another officer responded to the home and recognized Appellant from the video surveillance he had reviewed earlier at the store. The officer arrested Appellant and found Appellant's shorts, a wallet with a debit card matching the card used at the convenience store, and a six-pack of beer in the bed of the pickup truck.

When police arrived at the convenience store, Huntley was unresponsive. Huntley spent several weeks in the hospital recovering from his injuries and underwent surgery for the injuries to his abdomen and hip. Huntley, Bolden and the store clerk positively identified Appellant in a photo lineup as the shooter.

The State charged Appellant with first-degree assault and armed criminal action. The jury found Appellant guilty on both charges. The trial court sentenced Appellant to two concurrent terms of twenty years of imprisonment. This appeal follows.

On appeal, Appellant argues the trial court erred in refusing to submit a self-defense instruction proffered by the defense because there was substantial evidence supporting its submission.

(Resp. Ex. C, pp. 2-5).

## III. ANALYSIS

**A. Trial Counsel was not Ineffective for Failing to Investigate Certain Medical Evidence Supporting an Alleged Mental Health Defense. This Court Defers to the Missouri Court of Appeals' Decision on This Issue (Responds to the First Ground for Relief).**

In his first ground for relief, Richardson argues his "[c]ounsel did not investigate medication evidence" that would have supported a defense that Richardson suffered "severe withdrawal effects" from a drug known as "Effexor," which allegedly caused him to suffer "paranoid and [a] distorted perception" when he shot Huntley. Richardson says "[t]he medication evidence would have supported [his] claim of self-defense." Richardson raised this claim during his state post-conviction appeal (Resp. Ex. F, p. 12), and the Missouri Court of Appeals denied it. (Resp. Ex. H, pp. 3-7). Claims that have been previously adjudicated on the merits in state court "shall not be granted" relief unless the state court's decision contradicted or unreasonably applied clearly-established federal law or resulted in an unreasonable determination of the facts. 28 U.S.C. § 2254(d).

The Missouri Court of Appeals applied the proper standard for evaluating whether counsel was ineffective. (Resp. Ex. H, p. 3); *see Strickland v. Washington*, 466 U.S. 668 (1984). To succeed under the *Strickland* ineffectiveness standard, a petitioner must show that counsel's conduct fell below reasonable professional standards and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. There is "a strong presumption that

6

counsel's conduct falls within the wide range of reasonable professional assistances." *Id*.

at 689.

Richardson failed to show counsel's conduct was unreasonable or that he was

prejudiced by counsel's actions. The Missouri Court of Appeals gave a detailed

explanation why there was no misconduct by trial counsel nor resulting prejudice:

> For his first point on appeal, movant alleges the motion court clearly erred in denying relief on his claim that trial counsel was ineffective for failing to investigate and present evidence at trial of movant's mental-health history and the side effects he was experiencing from his abrupt withdrawal from a prescription medication. The motion court held an evidentiary hearing, at which both counsel and movant testified. The motion court denied movant's claim, finding that counsel's decision not to present such evidence was clearly a reasonable strategic decision.

> Counsel has wide discretion in determining what strategy to use in defending his client. *Shelton v. State*, 440 S.W.3d 464, 469 (Mo. App. E.D. 2014). Reasonable choices of trial strategy, no matter how ill-fated they appear in hindsight, cannot serve as a basis for an ineffective-assistance-of-counsel claim. *Worthington v. State*, 166 S.W.3d 566, 573 (Mo. banc 2005). To prevail on his claim, movant must overcome the strong presumption that the challenged action was reasonable and effective trial strategy. *Shelton*, 440 S.W.3d at 470. In reviewing trial strategy, we evaluate the conduct of counsel from his perspective at the time of the conduct. *State v. Light,* 835 S.W.2d 933, 940 (Mo. App. E.D.1992).

> Trial counsel – a seasoned attorney, with thirty years' experience, who has tried well over one hundred jury trials, and whose practice consists of largely criminal-defense work – knew he had a strategic choice between a defense based on defendant's mental health and one based on self-defense. He met with the movant, and talked with him at great length in the months leading up to the trial. The two discussed the evidence, and watched the surveillance video of the incident several times. They also discussed whether to plead guilty or proceed to trial. And they discussed potential defenses. Counsel knew that movant had a mental-health diagnosis, and that he had stopped taking his prescription medication. Counsel and movant talked at great length about how these issues might affect movant's trial. Counsel reviewed movant's medical records and talked with movant's psychiatrist about the effects of movant's medications. Counsel also spoke

with his trial expert about the possibility of using movant's mental condition as a defense. Counsel considered the possibility that defendant was not competent to stand trial and that he was not guilty by reason of insanity, but ultimately concluded that those possibilities did not apply to movant.

In the end, movant decided to proceed to trial, and counsel chose a self-defense strategy in accordance with movant's stated reason for shooting the victim. Counsel testified that "from the get-go," movant consistently maintained that the victim was armed and that he had shot the victim in self-defense. Movant testified at the evidentiary hearing that he did not disagree with the self-defense defense. Counsel believed that presenting evidence of a mental condition would have hurt that defense. He believed that if he presented such evidence, the jury would view the surveillance video and see movant as one who overreacted to a situation, and not as one who was acting out of self-defense. Counsel wanted to present movant "as clean as possible," with regard to movant's encounter with the victim. Indeed, evidence of movant's mental health and his violent behavior would have contradicted the strategy of presenting movant as a law-abiding man who acted out of self-defense.

Counsel investigated several different possible strategies for movant's defense. Consequently, we will rarely second-guess counsel's actual choice. *Middleton v. State,* 103 S.W.3d 726, 736 (Mo. banc 2003). "Trial counsel is normally in the best position to assess the trade-offs involved in selecting particular defenses." *Id.* Strategic choices made after a thorough investigation are "virtually unchallengeable." *Id.* at 736-37. Movant's contention that trial counsel failed to thoroughly investigate is belied by the record. Given the facts and evidence before him, counsel made a reasonable choice of defenses. "Counsel will not be found ineffective for choosing to pursue one reasonable trial strategy to the exclusion of another." *McFadden v. State*, 553 S.W.3d 289, 309 (Mo. banc 2018).

We lastly address a few additional flaws in movant's argument. Movant alleged in his motion that he had abruptly stopped taking his medications several days before the shooting. He persists in this assertion on appeal. According to trial counsel, however, movant told him that he had not taken the medication for quite some time, maybe even over a year prior to the shooting. The motion court was free to believe trial counsel and to disbelieve movant. Just as the motion court was free to disbelieve movant's testimony that at the time of the shooting, he was suffering from withdrawal effects, such as hostility, aggressiveness, and paranoia. *Gold v. State*, 341 S.W.3d 177, 180 (Mo. App. S.D. 2011). Even if believed,

movant has not shown how such evidence would have changed the outcome of his trial. Movant attributes his action in shooting victim to withdrawals from abruptly stopping his medication. But he admitted at the sentencing hearing that he was violent and would occasionally go into a rage and "smash stuff," even before he started the medication, and that he continued to drink and throw fits even while taking the medication. In short, movant admitted he was violent both while he was on the medication and when he was not. Movant has not shown how the desired evidence would have provided a viable defense.

Movant also contends a reasonable probability exists that but for counsel's decision, the jury would have acquitted him of first-degree assault and convicted him of the lesser offense of second-degree assault premised on sudden passion, but that defense arises out of provocation and is an objective standard, not altered by a defendant's mental condition. *Clark v. State*, 30 S.W.3d 879, 883 (Mo. App. S.D. 2000). Trial counsel cannot be ineffective for failing to present evidence that would not have supported the defense. *See Davis v. State*, 486 S.W.3d 898, 913 (Mo. banc 2016).

Lastly, movant contends that the trial court would have imposed a lesser sentence had counsel presented evidence of his mental condition and his withdrawal symptoms. But movant presented this information to the court at the sentencing hearing. He told the court about his long battle with alcoholism. He told the court about his prescription medications. And he called several character witnesses to testify about his struggles. The proclaimed, desired information was before the court, for the court's consideration as mitigating circumstances. Movant has thus failed to show that but for trial counsel's decision, he would have received a lesser sentence.

Defendant bore the burden of proving this claim by the preponderance of evidence. Rule 29.15(i). He failed to do so. Counsel made a reasonable choice. And it is not ineffective assistance of counsel to pursue one reasonable trial strategy to the exclusion of another reasonable trial strategy. *Worthington*, 166 S.W.3d at 573. After full review of the record, we discern no mistake. The motion court did not err in denying this claim. We deny this point.

(Resp. Ex. H, pp. 3-7).

Richardson accuses the Missouri Court of Appeals' of lying about the facts—of

"playing a shell-game [and] using wordplay to justify" further violation of his

constitutional rights. Richardson says the court's factual recitals are "absurd and baseless," and he points to his own appendix of "evidence" that he says contradicts everything the appellate court relied on. As mentioned above, an "unreasonable determination of the facts" may support granting a writ of habeas corpus. 28 U.S.C. § 2254(d). But, here, no such unreasonableness can be found.

For example, the Missouri Court of Appeals explained that "[c]ounsel [] spoke with his trial expert about the possibility of using movant's mental condition as a defense," but "[i]n the end … chose a self-defense strategy in accordance with movant's stated reason for shooting the victim." (Resp. Ex. H, pp. 4-5). Richardson takes issue with this characterization, saying "[c]ounsel did not investigate medication evidence." In support, Richardson cites to the post-conviction trial transcript; but, that transcript actually shows the opposite of his allegations. Counsel testified that he "***did*** speak to someone, Dr. Rao, [about the] medication" though he couldn't specifically "recall speaking to more than one doctor." (emphasis added). He went on to explain that "Dr. Rabun testified for us, and it would surprise me if I didn't at least mention Jeffery's condition to Dr. Rabun as a possibility of a defense, but, again, that was not a defense that I think was available to us." (Resp. Ex. K, p. 13). Contrary to Richardson's allegations, then, the record does not show that counsel altogether failed to "investigate medical evidence"—he simply didn't see it as viable.

As another example, the Missouri Court of Appeals explained that "[Richardson] told [his counsel] that he had not taken the medication for quite some time, maybe even over a year prior to the shooting." (Resp. Ex. H, p. 6). Thus, counsel would not have had

much reason to rely on a defense predicated on withdrawal symptoms. But, Richardson counteracts this finding by pointing, again, to the post-conviction trial transcript, in which he testified that he actually stopped taking the medication "about two days" before the shooting occurred. (Resp. Ex. K, p. 26). Even so, this cited-to testimony does not directly refute the appellate court's findings—what Richardson said during a post-conviction evidentiary hearing, and what he told his counsel in the lead up to trial, are two separate matters. "A fair assessment of attorney performance requires … [the court] *to evaluate the conduct from counsel's perspective at the time*." *Davis v. U.S.*, 858 F.3d 529, 534 (8th Cir. 2017) (emphasis in original). Richardson points to no record that refutes the appellate court's finding that he told his counsel something different than what he testified to before the trial court on his motion for post-conviction relief. Regardless, even assuming counsel was told before trial that Richardson stopped taking his medication just days before the shooting, counsel made clear that he still would not have seen it as a viable strategy:

> **Q.** As you sit here today would you have done anything different with regard to the defense of—that is being suggested here that Mr. Richardson's withdrawal from the Effexor, the anxiety medication, would have been a legitimate defense in this case?
>
> **A.** No, that was not a defense in my mind in this case.

(Resp. Ex. K, p. 20). When asked why counsel did not believe the medication withdrawal defense was viable, he explained that it would have undercut the self-defense angle that was pursued instead:

11

**Q.** So you just said earlier that you did some investigation, that you would feel compelled to do an investigation with these types of facts. What sort of investigation did you do?

**A.** A lot of this is going on my memory. You know, I had in my notes talking about calling Dr. Rao, I believe, who is his mental health professional, reviewing the mental health notes. We didn't actually order a psychiatric exam, as I recall. I don't think it was warranted in this case. You know, here is the way I go through it. Ultimately, I think, you have to make a decision when it -- when there is a self-defense case, and Jeffery from the get-go said this was self-defense, I believe that the guy was armed and I fired my weapon accordingly. Okay. In my mind there is -- strategy is do you go down the road of mental health problems that perhaps his intent was negated in some way by whatever mental health issues he was suffering from or self-defense. To my way of thinking that's kind of an either or decision because I think if you go down the road of self-defense then you are not saying I shot him because I'm crazy or because I had a mental health issue.

**Q.** So your feeling at the time was that those things were incongruous with each other, contradicted each other essentially?

**A.** Right. I think if you are going to go self-defense, you go self-defense all the way. You don't say, I shot you because I was suffering from mental disease or defect at the time or that my mental condition somehow negates my intent in the case.

(Resp. Ex. K, pp. 9-10).

This Court has carefully reviewed the record upon these examples and others; yet, nothing supports the view that the Missouri Court of Appeals made an "unreasonable determination of the facts." 28 U.S.C. § 2254(d). As it turns out, the self-defense strategy didn't work, and now Richardson wants to say his counsel erred by not picking a different strategy. Of course, counsel is entitled to "substantial deference" in his or her strategic decision-making, *Premo v. Moore*, 562 U.S. 115, 126 (2011), and there is no promise of "perfect advocacy." *Maryland v. Kulbicki*, 126 S.Ct. 2, 5 (2015). Perhaps

perceiving this deferential hurdle, Richardson seeks to retool the underlying facts to exhibit an incompetency on his counsel's part that simply isn't supported by the record. The Missouri Court of Appeals adequately explained why counsel chose not to pursue a mental health defense predicated on medication withdrawal and, wise or unwise in retrospect, this Court will not disturb that decision here.

**B. The Trial Court did not Err in Refusing to Give a Jury Instruction on Self-Defense. This Court Defers to the Missouri Court of Appeals' Decision on This Issue (Responds to the Second Ground for Relief).**

In his second ground for relief, Richardson argues the "trial court erred in refusing [to give a] self-defense instruction." Richardson says "Huntley struck [him] in the head inprovoked (sic)," which he argues justified his shooting of Huntley. Richardson properly raised this claim during his direct appeal, *see Shockley v. State*, 579 S.W.3d 881, 900 (Mo. banc. 2019) ("trial error [] is outside the scope of [Rule 29.15] postconviction relief proceedings"), and the Missouri Court of Appeals denied it. (Resp. Ex. A, p. 16; Resp. Ex. C, pp. 5-9). Claims that have been previously adjudicated on the merits in state court "shall not be granted" relief unless the state court's decision contradicted or unreasonably applied clearly-established federal law or resulted in an unreasonable determination of the facts. 28 U.S.C. § 2254(d).

A trial court is "required to give an instruction on self-defense [when the defendant] (1) was not the initial aggressor, and (2) reasonably believed the use of deadly force was necessary to protect himself from death, serious physical injury, or a forcible felony." *State v. Barnett*, 577 S.W.3d 124, 128 (Mo. banc. 2019) (citing § 563.031,

RSMo). The Missouri Court of Appeals rejected a self-defense instruction because

Richardson failed to satisfy the second prong:

> Viewing the evidence in the light most favorable to Appellant, there was not substantial evidence admitted at trial that could support a finding that Appellant had reasonable cause to believe it was necessary to use deadly force against Huntley to save himself from immediate danger of serious bodily injury or death. There is no evidence Appellant saw anything on Huntley's person or in his hand before Appellant fired two shots at Huntley. The testimony was only that Appellant saw a flash and saw Huntley reach down with one of his hands. While Appellant testified he believed that Huntley was reaching for a gun, he stated this belief was based upon Appellant striking him with his hand because "why would somebody attack you right out in front of the store" and he "figured" he was in big trouble and that Huntley was going to cause him "real damage."

> This testimony does not support a finding there was a real or apparently real necessity for Appellant to use deadly force against Huntley. A single strike to the face does not reasonably lead to the conclusion that a person is armed and that one is in immediate danger of serious bodily injury or death, such that it would justify Appellant's response, which was to immediately draw and fire a deadly weapon. Nor does Appellant's testimony that he fired a second shot after Huntley appeared to raise his arms and lunge at Appellant support a self-defense instruction, as raising the arms and lunging does not, by itself, present a real or apparently real necessity to kill in order to save oneself from immediate danger of serious bodily injury or death.

> Finally, there was no substantial evidence presented at trial to support the fourth requirement of a self-defense instruction, that being whether there was an attempt by Appellant to do all within his power consistent with his personal safety to avoid the danger and the need to take a life. Here, upon being struck in the face once by Huntley, Appellant instantly drew his weapon and fired two shots at Huntley. There is no evidence that Appellant made any attempt to avoid the danger but instead immediately responded with deadly force.

> Appellant's point on appeal is denied.

(Resp. Ex. C, pp. 6-9).

Richardson argues "self-defense is for the jury to decide," and accuses the state courts of error in withholding from the jury a self-defense instruction under its own interpretation of the facts. But, of course, "[w]hether the defendant has produced the quantum of evidence necessary to support the submission of a self-defense instruction is a question of law for the trial court." *Fisher v. State*, 359 S.W.3d 113, 119 (Mo. App. W.D. 2011) (citing *State v. Nunn*, 697 S.W.2d 244, 246 (Mo. App. E.D. 1985)). Self-defense only becomes an "an issue for the fact-finder when there is conflicting evidence or different inferences could be reasonably drawn from the evidence." *State v. Jones*, 553 S.W.3d 909, 914 (Mo. App. S.D. 2018). With the courts' initial gatekeeping function in mind, the question here turns on whether the state courts' refusal to give a self-defense instruction *as a matter of law* violated a federal protection—namely, Richardson's rights under the Due Process Clause of the Fifth and Fourteenth Amendments. *See Woods v. Solem*, 891 F.2d 196, 199 (8th Cir. 1989) (discussing when the refusal to issue a self-defense instruction violates the U.S. Constitution).

Here, the Court finds no error in the Missouri Court of Appeals' conclusion that "a single strike to the face" does not warrant the use of deadly force, such that the self-defense argument simply failed as a matter of law upon the elements. (Resp. Ex. C, p. 8). Given its irreversible nature, deadly force is not justified "in response to fear of being grabbed or even punched," nor is it justified to "repel a simple assault and battery." *State v. Bruner*, 541 S.W.3d 529, 538 (Mo. banc. 2018). Yet, that is exactly what happened here. The Missouri Court of Appeals aptly sums it up: "[a] single strike to the face does not reasonably lead to the conclusion that a person is armed and that one is in immediate

15

danger of serious bodily injury or death, such that it would justify Appellant's response, which was to immediately draw and fire a deadly weapon." (Resp. Ex. C, p. 8). This is not a case where Richardson's life was verbally threatened beforehand, putting him on heightened alert, nor in the aftermath of the battery did Richardson ever see a gun—or something that appeared to be a gun—such that instinct might dictate an escalation in force. *See Barnett*, 577 S.W.3d at 129 (self-defense instruction warranted where victim, the aggressor, threatened defendant's life—telling him he was "going to die"—and defendant, engaged in a physical altercation, saw what he believed was a gun coming towards his face). Accordingly, because the facts did not warrant a jury submission on the issue of self-defense, there is no due process violation for which to merit disturbing the conclusions of the Missouri Court of Appeals. *See Crump v. Caspari*, 116 F.3d 326, 327 (8th Cir. 1997) (refusal to give self-defense instruction did not violate due process where instruction was not warranted under the facts). Richardson's second ground for relief is denied.

### C. The Trial Court did not Err in Failing to Object to Prosecutorial Misconduct. This Court Defers to the Missouri Court of Appeals' Decision on This Issue (Responds to the Third Ground for Relief).

In his third ground for relief, Richardson argues his trial counsel was ineffective "due to failure to object to prosecutorial misconduct which caused prejudice and judicial bias." Specifically, "[p]rosecution inserted intent into defendant's actions, stating that Mr.

Richardson wanted to 'put down' Mr. Huntley."[1] Richardson properly raised this claim during his post-conviction appeal, and the Missouri Court of Appeals denied it. (Resp. Ex. F, p. 12; Resp. Ex. H, pp. 7-10). Claims that have been previously adjudicated on the merits in state court "shall not be granted" relief unless the state court's decision contradicted or unreasonably applied clearly-established federal law or resulted in an unreasonable determination of the facts. 28 U.S.C. § 2254(d).

The Missouri Court of Appeals rejected Richardson's prosecutorial misconduct argument because the prosecutor's characterization—that Richardson "put down" Huntley—was supported by the evidence. Moreover, even if the characterization was objectionable, the decision not to object is generally a strategic one and there was no showing that this strategy, even if ill-advised, ultimately tainted the trial:

> For his second point, movant alleges the motion court erred in denying relief on his claim that trial counsel was ineffective for failing to object to the prosecutor's statement in closing argument that movant "advanced" on victim to "put him down." The motion court denied this claim without an evidentiary hearing, finding that the complained-of statement was at the very beginning of the State's argument, that the statement was a reasonable inference based on evidence at the trial, and that the statement could not have had a decisive effect on the outcome of movant's trial. We discern no mistake. Read in context, the prosecutor was imploring the jury to view the evidence, including the surveillance tape, and his statement is supported by that evidence.
>
> "Ineffective assistance of counsel is rarely found in cases where trial counsel has failed to object." *Murphy v. State*, 512 S.W.3d 125, 130 (Mo. App. E.D. 2017). "Trial counsel is granted vast latitude and judgment about

---

[1] Richardson also tangentially suggests "judicial bias" in the trial court's reference to the shooting as an "execution." This claim, if it is made separately, was not presented to the state courts and is, therefore, procedurally defaulted. *See Kennedy v. Kemna,* 666 F.3d 472, 480 (8th Cir. 2012) ("A claim is procedurally defaulted if a habeas petitioner failed to raise it in state proceedings.").

whether or when to make objections." *Greer v. State*, 406 S.W.3d 100, 105 (Mo. App. E.D. 2013). To establish ineffective assistance of counsel based on counsel's failure to object during closing argument, movant must show that his counsel's objections would have been upheld if made and that the failure to object resulted in a substantial deprivation of his right to a fair trial. *Glass v. State*, 227 S.W.3d 463, 473 (Mo. banc 2007). Failure to make a non-meritorious objection is not ineffective. *Id*. Counsel's failure to object during closing argument is generally not error, but is a function of trial strategy. *Anderson v. State*, 196 S.W.3d 28, 38 (Mo. banc 2006). It is well-recognized that even seasoned trial attorneys will often times not object to otherwise improper questions or arguments for strategic purposes because "it is feared that frequent objections irritate the jury and highlight the statements complained of, resulting in more harm than good." *Barton v. State*, 432 S.W.3d 741, 754 (Mo. banc 2014); *Marshall v. State*, 567 S.W.3d 283, 293 (Mo. App. E.D. 2019). As such, counsel's failure to object is presumptively trial strategy and will not support an ineffective assistance of counsel claim unless movant shows otherwise. *Barnes v. State*, 334 S.W.3d 717, 723 (Mo. App. E.D. 2011).

Trial counsel would not have been successful had he objected to the prosecutor's comment. "A prosecutor is allowed to argue the evidence and all reasonable inferences from the evidence during closing arguments." *State v. Brown,* 337 S.W.3d 12, 14 (Mo. banc 2011). A prosecutor may characterize a defendant and his criminal conduct as long as the evidence supports such a characterization. *State v. Simmons*, 944 S.W.2d 165, 182 (Mo. banc 1997). And the evidence here amply supports the prosecutor's comment.

That movant advanced on the victim is supported by the victim's testimony that movant kept approaching him, kept walking towards him, and kept bothering him. The testimony of the victim, an eyewitness, and the surveillance tape show that movant first approached the victim while the victim sat in his car. Movant then left, and returned to his car. Victim exited his car and walked across the parking lot towards the convenience store, in order to get his cousin, who was inside the store, because victim did not like the situation. As the victim exited his car, movant also exited his car. As movant walked toward the door of the store, he kept watching over his shoulder. Movant approached the victim again, coming into "close" proximity of the victim. Victim turned and faced the movant, and told him to leave him alone. Victim backed up from movant, but the movant still walked toward the victim. The victim put his hand out, but movant kept walking towards the victim. The victim then swatted at movant, and continued to back up, ultimately coming to a stop, directly facing the

movant. Movant kept walking towards the victim, then drew his gun and shot the victim.

That victim was "put down" by movant is supported by the victim's own testimony that he fell after getting shot. The surveillance video shows victim falling backwards when first shot. And the store clerk testified that he heard gun shots and then saw the victim "down."

Even if counsel should have objected, given the evidence of movant's guilt, movant makes no showing or reasonable argument that he was deprived of a fair trial or that the statement had a decisive effect on the outcome of the trial.

After full review of the record, we discern no mistake. The motion court did not err in denying this claim. We deny this point.

(Resp. Ex. H, pp. 7-10).

At this stage, Richardson has done little more than repeat the points on appeal from his post-conviction briefing. The only real addition he has made is to over-emphasize the meaning of the preposition "to." Richardson says the prosecutor erred in using the phrase "to put down" in characterizing Richardson's attack on Huntley. Richardson says the prosecutor "used the word 'to' [in] speculating as to [the] motive [of Richardson] and implying malicious intent." Whatever one might attribute to the rather innocuous word "to," it was not actually spoken by the prosecutor—Richardson mischaracterizes the record. To be sure, the prosecutor, in closing, actually said:

Today is the day that you have to go back there and do justice for Marvin Huntley. **Marvin was shot, was put down by the defendant on September 12, 2011 here in the City of St. Louis**. Why would somebody attack him in the gas station lot? We don't know. We don't know. But he did, because you heard from Marvin, you heard from Ricky, you heard from Markesha, you heard from David, you heard from the police officers and you saw the video. You know what happened after all of that evidence.

(Resp. Ex. L, pp. 675-676 (emphasis added)). As the Missouri Court of Appeals found, the evidence supports the characterization that Richardson, by shooting Huntley, "put [him] down" when he fell backwards as a result. This Court finds nothing about the Missouri Court of Appeals' decision contrary to clearly-established federal law or based on an unreasonable determination of the facts, see 28 U.S.C. § 2254(d). Accordingly, this Court will defer to the Missouri Court of Appeals' decision on this issue and denies Richardson's third ground for relief.

### D. Richardson's Fourth Ground for Relief is Procedurally Defaulted.

In his fourth ground for relief, Richardson argues his trial counsel was ineffective "due to failure to rehabilitate Officer Stevens' testimony." Specifically, he claims that the prosecutor had texted Stevens before giving testimony "telling him to change it." Looking at the trial transcript pages that Richardson cites in support, the prosecutor had apparently texted Stevens notifying him that his prior testimony would not actually match up to the photographs in the prosecutor's possession:

> **Q.** Do you recognize those photographs?
> **[Stevens].** Yes.
> **Q.** Do you recognize what's depicted in the photographs?
> **A.** Looks like the front of the house.
> **Q.** And the interior of the house?
> **A.** Uh-huh.
> **Q.** Would that appear to be correct, a picture of the front of the house? If you know, is that a picture of the front of the house and then a picture from the front inside the house? Look correct to you?
> **A.** Yeah, I guess.
> **Q.** Do you recall previously testifying in this matter?
> **A.** Yes.
> **Q.** At that time you said you saw Mr. Richardson go out the back door of that house from where you were standing in the front.

**A.** Seems like he went to the rear of the house, so I assume he went out the back.

**Q.** In fact, you had testified under oath that you did see him go through the house through the back door, correct?

**A.** Yes, sir.

**Q.** Were you since notified by the prosecutor attorney of these photographs?

**A.** I'm sorry?

**Q.** Subsequent to your testimony, did the prosecuting -- did you have a chance to talk to the prosecuting attorney, or did you get a text message from her or whatnot about these photographs?

**A.** Yes.

**Q.** So she notified you that those photographs actually belie the fact that you can't really see through that house, can you?

**MS. BOSTON**: Objection, argumentative.

**THE COURT**: Sustained.

(Resp. Ex. L, pp. 534-535). This Court can only assume what Richardson is really getting at is that he wanted his trial counsel to *impeach*—not *rehabilitate*—Officer Stevens, a witness hostile to Richardson, who purportedly lied about what transpired at Richardson's house after the shooting. Based on the transcript, that is exactly what trial counsel attempted to do—this Court sees no error on counsel's part based on Richardson's claim.

In any event, Richardson did not actually bring this claim to the attention of the state courts. He began to do so, in a *pro se* motion, but later abandoned it when counsel wrote an amended motion on his behalf that did not include any mention of impeaching (or rehabilitating) Stevens. (*Compare* Resp. Ex. J, p. 12; *with* Resp. Ex. J, pp. 22-40). The simple fact is, neither the trial court nor the Missouri Court of Appeals considered this argument—it being abandoned through the filing of the amended motion. (Resp. Ex. J, pp. 51-54; Resp. Ex. H). Thus, this claim is procedurally defaulted. *See Sweet v. Delo*,

21

125 F.3d 1144, 1149 (8th Cir. 1997) ("[F]ailing to present [a claim] to the Missouri courts at any stage of [petitioner's] direct appeal or his post-conviction proceedings" renders it procedurally defaulted). Richardson attempted to bypass the procedural default by arguing it was his counsel's fault for not raising this claim in the amended motion; but, as this Court explained above, there was no legal basis for raising it in the first place. "A procedurally defaulted claim must be 'substantial' for the default to be excused—that is, the claim must have "some merit.'" *Thomas v. Payne*, 960 F.3d 465, 474 (8th Cir. 2020) (quoting *Martinez v. Ryan*, 566 U.S. 1, 14 (2012)). Having shown no merit for this particular claim in his briefing to this Court, Richardson's fourth ground for relief is denied.

## IV. CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that petitioner Jeffery S. Richardson's petition for a writ of habeas corpus (ECF #1) is **DENIED**. This Court will not issue a certificate of appealability. Judgment to follow.

So ordered this 3rd day of September 2020.

_____
STEPHEN N. LIMBAUGH, JR.
SENIOR UNITED STATES DISTRICT JUDGE